IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                              CRIMINAL CASE NO. 2:21-00160

JULIO HISAEL ALMONTE

### MEMORANDUM OPINION AND ORDER

Before the court is the motion of defendant Julio Hisael
Almonte to suppress evidence. (ECF No. 24.)  Defendant asks the
court to suppress "all evidence derived from (1) the stop of the
vehicle he was driving on June 30, 2018, and (2) the subsequent
seizure and search of his cell phone." (Id.)  The court held a
hearing on the motion on January 12, 2022.  At the conclusion of
the hearing, the court took the matter under advisement and
granted the parties leave to file supplemental briefs, which
they have now done.  For the reasons that follow, the court will
deny the motion.

I.    **Background**

On the morning of June 30, 2018, West Virginia State Police
Trooper Eric Bostic ("Trooper Bostic")[1] was at the Sutton
detachment of the West Virginia State Police, which is located
next to the 911 dispatch center for Braxton County. (Jan. 12
Hr'g Tr. 7.)  At 8:30 a.m., Trooper Bostic received a call from

_____

[1] The court found Trooper Bostic's testimony credible and relies
on his testimony in making these findings of fact.

the 911 dispatch center regarding a possible hit-and-run nearby involving a gray pickup truck pulling another vehicle on a trailer, which was then reportedly heading north on I-79.[2]  (Tr. 7-8.)

Trooper Bostic was ready to go when he received this call, and his police vehicle was right outside the door.  (Tr. 40-41.) He immediately travelled to the Flatwoods exit and staged there, at the entrance ramp, to watch for the pickup truck.  (Tr. 8-9, 40-41.)  The Flatwoods exit is less than 1 mile from the Sutton detachment and approximately 5 miles north of where the hit-and-run reportedly occurred, which was at Exit 62, otherwise known as the Gassaway exit.  (Tr. 8.)  By the time Trooper Bostic reached his staging area, only a few minutes had passed from when he received the report of the suspected hit-and-run.  (Tr. 9.)  Shortly thereafter, Trooper Bostic spotted a gray pickup truck pulling another vehicle (a blue van) on a trailer.  (Tr. 11, 41.)  The pickup truck was a Ford Raptor ("Raptor"), and defendant was the driver.  (Tr. 11.)[3]

---

[2] This was a phone call, not a radio dispatch; it is apparently common for the dispatch center to call the Sutton detachment when the dispatch center knows an officer is present at the station.  (Tr. 7, 45-46.)

[3] Trooper Bostic does not recall seeing a gray Toyota Tacoma (the vehicle actually involved in the hit-and-run), but he was not looking for a gray Toyota Tacoma, so it is possible that one passed by while Trooper Bostic was at the staging area.  (Tr. 43-44.)

Trooper Bostic initiated a stop of the Raptor. (Tr. 11.) He did not notice any damage to the Raptor, but he did not immediately inspect the front of it; instead, he went directly to the window at the passenger side of the Raptor, and defendant rolled down the passenger window. (Tr. 13-14, 36.) Trooper Bostic requested proof of registration, proof of insurance, and identification from defendant. (Tr. 13.) Because Trooper Bostic was having trouble hearing defendant over the noise of the interstate, Trooper Bostic requested and received permission from defendant to open the passenger door. (Tr. 14.) Trooper Bostic and defendant engaged in a discussion of the suspected hit-and-run, and defendant was aware of the collision; he denied being involved in the collision and explained that a gray Toyota was involved, and he had pulled over to help. (Tr. 14.) Concerning the Raptor, defendant said that his brother-in-law, "O," had given him permission to drive it. (Tr. 14.)

Once the passenger door was open, Trooper Bostic smelled an odor of fresh marijuana, which he believed to be emanating from a "ditty bag" on the passenger seat. (Tr. 15-16.) Trooper Bostic, who has made hundreds of marijuana arrests throughout his career, sought and obtained permission from defendant to search the Raptor and the blue van that it was towing. (Tr. 16.) This was approximately five to ten minutes into the stop. (Tr. 47.)

The search yielded marijuana plus three identification cards bearing the same photo but different names, and purporting to be issued by different states; it also yielded a key fob to a gray 2017 Toyota Tacoma ("Tacoma") and the purchase paperwork for the Raptor and the Tacoma.[4]  (Tr. 16-18.)  The purchase paperwork indicated that D.F. had purchased the Raptor and A.F. had purchased the Tacoma.  (Tr. 16-19.)  Trooper Bostic believed that the ID cards were fraudulent.  (Tr. 18.)  A.F. was a name on one of the ID cards found during the search (in the van being towed), but the search did not yield an ID for D.F.  (Tr. 19-21.)

At some point, Trooper Bostic asked defendant where he was coming from, and defendant said that he had picked up the Raptor from his brother-in-law at the New Jersey state line and had driven it to Charleston to pick up the van that he was towing.  (Tr. 19-20.)  This struck Trooper Bostic as false because he had noticed that there were only 290 miles on the Raptor's odometer, which is obviously an insufficient number of miles to cover the distance from New Jersey to Charleston, let alone from the point of purchase in Charleston, up to New Jersey, back to Charleston, and then up to Braxton County.  (Tr. 19-20.)

---

[4] The key fob had a partial VIN matching the purchase paperwork for the Tacoma.

During the stop, an iPhone ("the phone") was sitting on the Raptor's console. (Tr. 21-22.) Trooper Bostic noticed calls and texts coming in from "O," but he could not see the content of the texts, and he did not try answering the phone. (Tr. 21-23, 51-52.) At first, defendant said that the phone belonged to his sister and that he did not have the passcode to it. (Tr. 22.) Later, he said it was his phone but that he still did not have the passcode and could access it only by facial recognition.[5] (Tr. 22.)

Approximately 2.5 hours into the stop, Trooper Bostic placed defendant under arrest for giving false information and for possessing marijuana. (Tr. 23.) During most of the time between that initiation of the traffic stop and the arrest,

---

[5] It is unclear exactly when defendant attempted to repudiate his denial of ownership of the phone. The record on this point is as follows:

> Q. Did Mr. Almonte say anything about whose phone that was?
>
> A. He originally said it was his sister's and he didn't have the password to it.
>
> Q. Did he say something different later on?
>
> A. Yes.
>
> Q. What did he say?
>
> A. That it was his phone, that it was his own facial recognition and he still didn't know the password.

(Tr. 22.)

Trooper Bostic was waiting to hear back from Deputy Williams of the Braxton County Sheriff's Department concerning his findings from the scene of the hit-and-run.  (Tr. 20, 48-49.)  It was not until Deputy Williams arrived that Trooper Bostic received confirmation that the same 2017 Toyota Tacoma for which defendant had a key fob was involved in the hit-and-run.  (Tr. 49.)

Trooper Bostic took defendant to the Sutton detachment and conducted two recorded interviews of defendant, each lasting less than fifteen minutes.  (Tr. 23-24; Hr'g Ex. 2.)  Defendant received and acknowledged his Miranda rights before these interviews.  (Tr. 24, 28, 33.)  The first interview took place before Trooper Bostic had contacted the dealerships where the Raptor and Tacoma were purchased and before Trooper Bostic had obtained a search warrant for the phone or examined the contents thereof.  (Tr. 28-29.)

After the first interview and after further investigative efforts, Trooper Bostic sought a warrant from a Braxton County magistrate.  (Tr. 28-30.)  The following is what Trooper Bostic knew at that time:

1. Defendant had lied about how he took possession of the Raptor, as the low mileage on the odometer flatly contradicted his story. (Tr. 19-20.)

2. The phone was receiving text messages from "O", who, in one version of defendant's story, had given defendant the truck.  (Tr. 14, 22.)

3. During defendant's first interview at the Sutton detachment (the "first interview"), he had given a different name of the person for whom he was allegedly transporting the Raptor. (Tr. 26.) He said that G.F. had met him at a gas station in Dunbar and showed him ID and paperwork indicating that G.F. had purchased the Raptor (thus, defendant thought things were "legit"); in fact, though, "D.F." was on the purchase paperwork found in the Raptor and provided by Todd Judy Ford. (Ex. 2.)

4. Trooper Bostic had spoken to the Todd Judy Ford dealership in Charleston and confirmed that a "D.F." had purchased the Raptor; he also found a "handshake" congratulatory photo that the dealership had posted on Facebook, revealing that someone with the same likeness as that found on the fraudulent ID cards in the Raptor (with names different than "D.F.") had purchased the Raptor. (Tr. 29-30.)

5. In the first interview, defendant had suggested that the phone would contain information corroborating his story that he drove down to Dunbar, West Virginia, from New Jersey and met a guy, G.F., at a gas station. (Ex. 2.)

6. Also in the first interview, defendant had denied knowing the driver of the Tacoma involved in the earlier hit-and-run, even though defendant had stopped at the scene of the accident and had the key fob to the Tacoma. (Ex. 2.)

7. Defendant had been evasive in his responses to questions during the first interview and had struggled to answer basic questions about his travel history. (Ex. 2.)

Trooper Bostic's application for a search warrant consisted of two parts: a written application and an oral interview with the magistrate (which was recorded). (Tr. 31-32.) Even together, they did not include all facts supporting probable cause to search the phone. The written application, called an "APPLICATION AND COMPLAINT FOR SEARCH WARRANT," contains six basic facts in support or a finding of probable cause to search the phone:

1. Trooper Bostic performed a traffic stop on the Raptor driven by defendant.

2. Defendant had a key for a Tacoma in the Raptor.

3. Another person, whose identification was in the Raptor, had purchased the Tacoma.

4. The Tacoma was in an accident on the interstate.

5. Defendant said his brother-in-law let him use the Raptor.

6. Defendant said his brother-in-law's phone number was in his phone.

(Ex. 4.)

As part of the application process, Trooper Bostic appeared before the magistrate, swore to the contents of the written application (which the magistrate repeated in the recording), and engaged in a colloquy with the magistrate concerning the facts that Trooper Bostic believed provided probable cause. (See Tr. 30-32; Jan. 12 Hr'g Ex. 1.)  The colloquy revealed the following facts:

1. Trooper Bostic had stopped defendant in the Raptor, and defendant said that his brother-in-law, D.F., owned it; the paperwork matched that name.

2. In a search to which defendant consented, Trooper Bostic found identification cards that appeared to be fraudulent because they had the same picture but different names and other identifying information, and which purported to be issued by different states.

3. The search also yielded a key fob to a 2017 Toyota Tacoma, which matched the Tacoma involved in a hit-and-run earlier that day.

4. Defendant stated that the Raptor's owner's phone number was on defendant's phone, but defendant would not provide

the number and did not want Trooper Bostic to look in the phone.

5. Trooper Bostic wanted to contact D.F. to investigate the hit-and-run and wanted to uncover information regarding the "fraudulent schemes" involving the purchase of the Raptor and Tacoma.

6. Trooper Bostic believed that the information on the phone was "pertinent to" the investigation.[6]

(Ex. 1.)

In the colloquy, the magistrate asked Trooper Bostic to confirm that the "items he would be looking for" that "could be concealed" in the phone were an "iPhone X, black in color, contents of said telephone and any removal of storage media upon this telephone, the text messages, Facebook, Facebook messages, contents, any videos or photographs contained in this storage media and said telephone." (Ex. 1.) Thus, the terms of Trooper Bostic's application requested, and the resulting warrant authorized, a search of the phone and <u>seizure</u> of the entire contents thereof. (Ex. 1; Tr. 56.)

Despite the authorization to seize everything on the phone, Trooper Bostic did not do a full download of the phone and does not know whether anyone ever did. (Tr. 54.) When asked why he

---

[6] In the recording, the magistrate asked Trooper Bostic whether he swore to the truth of the written application, but he never specifically asked Trooper Bostic to swear to the contents of the colloquy. Because defendant has not argued that the colloquy was unsworn, the court will assume without finding that the colloquy was a continuation of the written application, and as such, the oath to the facts in the written application extended to it.

provided a list of categories of information that could be seized even though the entire contents were up for grabs, Trooper Bostic stated he provided the list "[j]ust for different areas to look for information that would be pertaining to it." (Tr. 56-57.)[7]  Trooper Bostic explained that he did not know what communications applications defendant and his suspected co-conspirator were using when he sought the warrant.  (Tr. 56-57.) This is also why he did not list "WhatsApp" communications on the warrant, even though such communications are ultimately what he seized.  (Tr. 33-34, 57.)

After searching the phone and finding inculpatory messages in the WhatsApp application, Trooper Bostic conducted a second voluntary interview of defendant.  (Ex. 2.)  He began the interview by noting that he had obtained a search warrant of the phone.  (Ex. 2.)  He did not reveal his findings right away; instead, he waited until defendant made a statement apparently contradicting the content of the messages, at which point he noted the contradiction.  (Ex. 2.)  From the recording of the second interview, it seems that Trooper Bostic had defendant's phone open and was reviewing the messages between defendant and "O" during the second interview.  (Ex. 2.)

---

[7] Presumably, "it" was the fraudulent acquisition of the Raptor and Tacoma.

II.  __Analysis__

The challenge to the initial traffic stop falls flat.  Even though Trooper Bostic did not see damage to the Raptor, he had every other reason to stop the Raptor, and he did not unreasonably extend the duration of the stop.  As to the search of the Raptor, defendant lacks Fourth Amendment standing because he has no reasonable expectation of privacy in the Raptor. Thus, the evidence derived from the traffic stop and search of the Raptor should not be suppressed.

The evidence obtained through the search of the phone, and thereafter, is a more difficult matter.  The warrant ran afoul of the Warrant Clause by authorizing not just a search, but a seizure, of the entire contents of the phone.  There was no substantial basis for probable cause to believe that the contents of the phone were permeated with contraband or evidence of a crime.  That leaves the good faith exception, which applies here, albeit by a thin margin.  Under the totality of the circumstances, it was not entirely unreasonable for Trooper Bostic to rely on the warrant despite its overbroad grant of authority.  Under these facts, the deterrence value would run to the magistrate, not the officer, and the Supreme Court has stressed that neutral and detached magistrates are not proper objects of exclusionary-rule deterrence.

11

### a. The Traffic Stop

Defendant contests the lawfulness of the traffic stop.  A law enforcement officer may perform an investigatory stop if it is based on "reasonable suspicion that criminal activity may be afoot."  United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004).  A stop based on such reasonable suspicion is commonly referred to as a Terry stop, after the Supreme Court's decision in Terry v. Ohio, 392 U.S. 1 (1968).  See id.  In other words, "[a]n officer does not need a warrant or probable cause to briefly detain a civilian; instead, an officer may briefly detain a civilian when he has reasonable, articulable, personalized suspicion that the person is or has been engaged in illicit activity."  United States v. Avagyan, 164 F. Supp. 3d 864, 881 (E.D. Va. 2016), aff'd sub nom. United States v. Ghazaryan, 685 F. App'x 222 (4th Cir. 2017).

"To show the existence of reasonable suspicion, a police officer must offer specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot."  United States v. Bowman, 884 F.3d 200, 213 (4th Cir. 2018).  Although the reasonable suspicion standard requires "at least a minimal level of objective justification" based on "specific and articulable facts," it "is less demanding than the probable cause standard or even the preponderance of evidence standard."  Id.; Perkins,

363 F.3d at 321.  "Reasonable suspicion is a commonsense, nontechnical standard that relies on the judgment of experienced law enforcement officers, not legal technicians."  United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015) (quoting Ornelas v. United States, 517 U.S. 690, 695 (1996)).

It is well settled that a traffic stop amounts to a "seizure" under the Fourth Amendment and therefore must "not be 'unreasonable' under the circumstances." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008).  Traffic stops are usually, but need not be, based on a traffic violation: Reasonable suspicion of "any kind of ongoing criminal activity" will do.  See United States v. Davis, No. CR 3:19-00154, 2020 WL 354628, at *3 (S.D.W. Va. Jan. 21, 2020), aff'd, No. 20-4315, 2022 WL 94529 (4th Cir. Jan. 10, 2022).  "A lawful traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete' the purpose of the stop." Bowman, 884 F.3d at 209 (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)).  An officer needs either reasonable suspicion of criminal activity or consent if the officer "extend[s] the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose."  Williams, 808 F.3d at 245-46.

Defendant's motion argues that the traffic stop here was unjustified at its inception and that Trooper Bostic unreasonably extended its duration.  As to the claim of

unreasonable extension, it became evident at the hearing that
while Trooper Bostic was completing the "[o]rdinary tasks
incident to a traffic stop," Bowman, 884 F.3d at 210, he smelled
marijuana and received consent to search the Raptor, which
revealed marijuana and ID cards that were highly suspicious.
What is more, defendant acknowledged that he was at the scene of
the hit-and-run, so it would have been independently reasonable
for Trooper Bostic to await a report from the deputy at the
scene of the hit-and-run to dispel the suspicion that defendant
was implicated in that suspected crime.  Trooper Bostic did not
unreasonably expand the scope of the stop.  Moreover, he
discovered the evidence pertinent to this case relatively
quickly in the stop.

Defendant points out that the Raptor was undamaged.  That
is a good point.  But there are several reasons it is
insufficient to dispel Trooper Bostic's reasonable suspicion.
First, not all accidents, even those on an interstate, produce
conspicuous vehicle damage.  Second, Trooper Bostic reasonably
stopped at the passenger window and engaged defendant in
discussion before going to the front of the Raptor to inspect.
Third, the vehicle matched the description that defendant had
received[8] and, by defendant's admission, he was at the scene of

---

[8] The radio log indicates that the reported make of the truck
involved in the suspected hit-and-run was a Nissan.  (Tr. 12-

the hit-and-run.  Fourth, the timing is against defendant
because, by the time it may have become unreasonable for Trooper
Bostic not to inspect the front of the truck for damage,
defendant had admitted he was at the scene and Trooper Bostic
had detected the presence of marijuana and uncovered marijuana
pursuant to a search to which defendant had consented; he also
had uncovered the fraudulent ID cards.  The duration of the
seizure was reasonable.

Defendant's reply brief focuses on the argument that the
traffic stop was unjustified at its outset.  Specifically, he
argues that the stop was the result of an unreasonable mistake
of fact (that the Raptor was implicated in the hit-and-run).
"[I]f an officer makes a traffic stop based on a mistake of
fact, the only question is whether his mistake of fact was
reasonable."  United States v. Arias, 213 F. App'x 230, 232 (4th
Cir. 2007).  But such mistakes must be analyzed in light of any
exigencies.  See Davis, 2020 WL 354628, at *4 ("Courts and
officers both recognize the heightened exigency that exists

---

13.)  As a factual matter, the court rejects defendant's
contention that "it defies belief that the dispatcher would fail
to advise Trooper Bostic that the truck in question was a
Nissan, not a Raptor."  (ECF No. 38, at 2.)  Moreover, even if
the dispatcher did tell Trooper Bostic that the vehicle was
reported to be a Nissan, Trooper Bostic's testimony that what he
understood the object of his search to be was a gray pickup
pulling another vehicle was credible, and Trooper Bostic's
skepticism toward the public's ability to identify vehicles by
their make is reasonable.

where a car is readily mobile."). Defendant says that it was unreasonable to stop him because, again, the Raptor was undamaged, and because it was unreasonable for Trooper Bostic to pick the staging area that he did, given the passage of time and the short distance involved. Defendant adds that, "predictably," the Tacoma had "already passed by the time Trooper Bostic arrived" at the staging area. (ECF No. 38, at 2.)

Any mistake of fact attributable to Trooper Bostic related to the traffic stop (assuming there is one) was reasonable. As an initial matter, the record does not support the conclusion that the Tacoma had already passed. That Trooper Bostic does not recall seeing it proves little, because Trooper Bostic was not looking for it. Instead, he was looking for a gray truck pulling another vehicle, and that is exactly what he stopped. The record established that the Tacoma, making a getaway as it was, left first, so maybe it had already passed. It does not matter, though, because Trooper Bostic found that out well after he made the traffic stop. In any event, given the general timing of the events leading up to the traffic stop, it is apparent that Trooper Bostic used his training as a police officer to select an eminently reasonable staging location.

All defendant is left with, then, is his claim that the lack of damage rendered the stop unreasonable. The argument

does not persuade.  The lack of damage does not negate the fact that the Raptor matched the description that Trooper Bostic had received[9] and appeared when and where it was reasonably expected to appear.  Finally, the exigent nature of the search here, which was for a truck on the run, counsels against finding that any mistake was unreasonable.  The seizure was justified at its outset.

### b. The Search of the Raptor

The government has argued that defendant has no Fourth Amendment standing to object to the search of the Raptor because the Raptor was obtained fraudulently (by means of identity theft).  To have standing in this context, defendant must show that "a legitimate expectation of privacy in the invaded place," which means an expectation that is not only subjective but also reasonable.  United States v. Ferebee, 957 F.3d 406, 412 (4th Cir. 2020).  The expectation is reasonable if "society" is willing to accept it as such.  United States v. Castellanos, 716

---

[9] Assuming the dispatcher made an error in this description, and assuming the dispatcher was or could be considered a police employee, the error would not justify exclusion of the evidence deriving from the traffic stop.  Cf. Herring v. United States, 555 U.S. 135, 140 (2009) (holding exclusion of evidence inappropriate where derived from arrest based on negligent police recordkeeping error); Arizona v. Evans, 514 U.S. 1, 15–16 (1995) ("There is no indication that the arresting officer was not acting objectively reasonably when he relied upon the [erroneous] police computer record.").

F.3d 828, 832 (4th Cir. 2013).  Society is not prepared to
accept as reasonable an expectation of privacy in a stolen
vehicle.  See Byrd v. United States, 138 S. Ct. 1518, 1529
(2018); United States v. Mohammed, 572 F. App'x 203, 204 (4th
Cir. 2014) ("As a passenger in a stolen vehicle, Mohammed lacks
standing to challenge the search of the vehicle."); United
States v. Hargrove, 647 F.2d 411, 412 (4th Cir. 1981) (holding
that to establish standing defendant must show "at the very
least" innocent acquisition of searched vehicle).

There is a slight wrinkle here in that the car was not
"stolen" in the most basic sense of the word, but rather appears
to have been obtained by fraud (identity theft).  The bottom
line, however, is that defendant has not met his burden of
showing that he acquired possession innocently, so he has no
standing to contest the search of the truck.

But even if defendant had standing, his claim would fail
because (1) defendant's seizure (the traffic stop) was lawful at
its inception and not unreasonably prolonged; and (2) he
consented to the search of the truck and the van.[10]  Also,

---

[10] There appears to be an argument that because the phone was in
the fraudulently obtained Raptor (on the console, as opposed to
on defendant's person), defendant forfeited what would otherwise
be a reasonable expectation of privacy in the contents of the
phone.  See United States v. White, 504 F. App'x 168, 171 (3d
Cir. 2012) (no privacy interest in locked document box found in
stolen vehicle).  This is especially so given that defendant
distanced himself from the phone (did not use it during the

because Trooper Bostic detected the smell of marijuana emanating from the bag containing the marijuana and fraudulent ID cards, he had probable cause to search the bag.  In sum, defendant lacks standing to challenge the search of the truck, which, in any event, did not run afoul of the Fourth Amendment.

### c. The Search of the Phone

The search of the phone was pursuant to a warrant. Defendant contests the validity of that warrant on two bases. First, he says that the issuing magistrate lacked a substantial basis to find probable cause for a search of this magnitude (a search of the entire contents of the phone).  Second, and relatedly, he says that the search warrant was overbroad because it was "broader than the probable cause on which it [was] based."  (ECF No. 24, at 7 (quoting United States v. Hurwitz, 459 F.3d 463, 473 (4th Cir. 2006)).  Defendant appears to root this second basis in the Warrant Clause's "particularity" requirements, which require that warrants "particularly describe[e] the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  As to the good faith exception provided in United States v. Leon, 468 U.S. 897 (1984), defendant says that it does not apply here.

_____

stop), disclaimed ownership of it initially, and denied even knowing how to access the contents of the phone.  The court does not resolve this issue because the government did not raise it.

The court agrees with defendant that the search warrant is invalid, but not because it authorizes an overbroad <u>search</u> and not because it lacks particularity.  Rather, the warrant here is invalid because it authorizes <u>a seizure of the entire contents of the phone</u>, and there is no substantial basis to find probable cause to justify such a seizure.  The court acknowledges that the good faith exception is a close call, but under the totality of the circumstances, a reasonable officer in Trooper Bostic shoes could rely on the warrant.  Accordingly, the evidence derived from the search of the phone should not be suppressed.

### 1. Standing

Because defendant originally denied owning the phone (and even denied being able to open it), it is far from obvious that he has Fourth Amendment standing to contest the search of the phone.  This is because "[t]he law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property."  <u>United States v. Ferebee</u>, 957 F.3d 406, 412 (4th Cir. 2020).  "For purposes of challenging a search, this court and most others treat a disavowal of ownership of property as an abandonment of the property."  <u>Id.</u> at 413.  In this context, "standing" does not mean case-or-controversy standing under Article III of the United States Constitution; rather, it refers

to the "threshold inquiry" of whether a defendant has a reasonable expectation of privacy in the object of the search. See id. at 412.

Defendant bears the burden of proving Fourth Amendment standing. United States v. Smith, 21 F.4th 122, 130 (4th Cir. 2021). Fourth Amendment standing, however, is not a jurisdictional component of a motion to suppress, and the government must "reasonably contest[]" the standing issue before a defendant is expected to "demonstrate[e]" it. See United States v. Harris, No. 3:15CR170, 2016 WL 1441382, at *7 (E.D. Va. Apr. 11, 2016), aff'd, 688 F. App'x 223 (4th Cir. 2017).

Here, because the government has not argued that defendant lacks standing as to the phone, the court does not reach whether defendant abandoned the phone when he said it belonged to his sister and denied knowing how to access its contents (thereby forfeiting his Fourth Amendment standing to contest its subsequent search). The court assumes without finding that defendant successfully repudiated his earlier disclaimer of ownership of the phone and that he has a reasonable expectation of privacy in its contents.

### 2. The Warrant Clause

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

21

> Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly
> describing the place to be searched, and the persons
> or things to be seized.

U.S. Const. amend. IV. This Amendment stands sentry against the resurgence of "a regime of general warrants that gave British officials carte blanche to search and seize property of American colonists." United States v. Suggs, 998 F.3d 1125, 1132 (10th Cir. 2021); Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011) ("The Fourth Amendment was a response to the English Crown's use of general warrants, which often allowed royal officials to search and seize whatever and whomever they pleased while investigating crimes or affronts to the Crown."); United States v. U.S. Dist. Court for E. Dist. of Mich., 407 U.S. 297, 327 (1972) (Douglas, J., concurring) ("For it was such excesses as the use of general warrants and the writs of assistance that led to the ratification of the Fourth Amendment.").

One species of the general warrant, and the one that provoked the most resentment in colonial America, was called a writ of assistance. Thomas K. Clancy, The Framers' Intent: John Adams, His Era, and the Fourth Amendment, 86 Ind. L.J. 979, 1002 (2011). "The writ of assistance attested to the authority of the bearer to search places in which the bearer suspected uncustomed goods were hidden. It took its name from its command that all peace officers and any other persons who were present

'be assisting' in the performance of the search." Thomas Y. Davies, Recovering the Original Fourth Amendment, 98 Mich. L. Rev. 547, 750 (1999). Writs of assistance "gave customs officials 'broad latitude to search houses, shops, cellars, warehouses, and other places for smuggled goods' imported in violation of British tax laws." United States v. Cobb, 970 F.3d 319, 336 (4th Cir. 2020), as amended (Aug. 17, 2020), cert. denied, 141 S. Ct. 1750, 209 L. Ed. 2d 513 (2021) (Floyd, J., dissenting) (quoting United States v. Wurie, 728 F.3d 1, 3 (1st Cir. 2013)). The "[w]rits were not issued as a result of any information that contraband was stored at a specified place; instead, the customs officials could search wherever they chose." Clancy, The Framers' Intent, at 991.

In the famed "Writs of Assistance Case" of 1761, James Otis represented a group of Boston merchants in a challenge to the reissuance of such writs, following the death of King George II the previous year.[11] Id. at 992. "[N]o authority preceding Otis had articulated so completely the framework for proper search and seizure practices that was ultimately embodied in the Fourth Amendment's Warrant Clause." Id. As Otis argued, a young John Adams listened and took notes. Davies, Recovering the Original Fourth Amendment, at 690. Fifteen years later, on July 3, 1776,

---

[11] "The writs expired six months after the death of the sovereign." Thomas K. Clancy at 1061.

Adams suggested that "the argument concerning writs of
assistance in the superior court" was "the commencement of this
controversy between Great Britain and America."  Clancy, The
Framers' Intent, at 1004.

The Warrant Clause demands clarity in what is to be
searched and seized; it also demands restraint in the scope of
what is to be searched and seized in accordance with the bounds
of the existing probable cause.  See United States v. Manafort,
323 F. Supp. 3d 795, 801 (E.D. Va. 2018).  The requirement of
particularity and prohibition on overbreadth are "related but
distinct concepts."  Id.  One court has compared them thus:

> The particularity rule and the probable cause rule
> serve a common purpose:  to protect privacy by
> prohibiting a general, exploratory rummaging in a
> persons [sic] belongings.  Although the two rules
> serve the same ultimate purpose, they achieve the
> purpose in distinct ways.
>
> The particularity rule requires the magistrate to make
> sure that the warrant describes things with reasonable
> precision, since vague language can cause the officer
> performing the search to seize objects on the mistaken
> assumption that they fall within the magistrate's
> authorization.  The probable cause rule prevents the
> magistrate from making a mistaken authorization to
> search for particular objects in the first instance,
> no matter how well the objects are described.  The two
> separate rules must both be met since an unnecessary
> invasion of privacy can occur either when the
> magistrate has a firm command of the doctrine of
> probable cause and a poor command of the English
> language, or vice versa.

United States v. Weber, 923 F.2d 1338, 1342 (9th Cir. 1990)
(citations and quotation marks omitted).  Despite this

distinction, courts often analyze challenges based on the two requirements under the general banner of particularity.  See Adam M. Gershowitz, The Post-*Riley* Search Warrant: Search Protocols and Particularity in Cell Phone Searches, 69 Vand. L. Rev. 585, 638 (2016) ("A few courts have recognized that particularity and overbreadth are two distinct legal issues. Most cases intermingle the two concepts, however.") (citation and quotation marks omitted).

### 3. Breadth of the Search

Warrants must not authorize a search or seizure greater in scope than existing probable cause can sustain; otherwise, they are overbroad.  See Manafort, 323 F. Supp. 3d at 801 (noting that scope must "be limited by the probable cause on which the warrant is based."); United States v. Skinner, No. 3:19CR19, 2021 WL 1725543, at *9 (E.D. Va. Apr. 29, 2021) (noting that "the breadth requirement commands that probable cause exist for the items that are listed [in the warrant].").

As to the scope of an electronic search, if there is probable cause to search a computer for evidence of a crime, that probable cause is usually sufficient to sustain a search of the entire computer.  See Cobb, 970 F.3d at 329; United States v. Williams, 592 F.3d 511, 520 (4th Cir. 2010).  A search of a cell phone is analogous to a search of a computer.  See Riley v. California, 573 U.S. 373, 393 (2014); United States v. Bishop,

910 F.3d 335, 337 (7th Cir. 2018). And a search of a computer is analogous to a search of a large file cabinet. Williams, 592 F.3d at 523 ("[W]e conclude that the sheer amount of information contained on a computer does not distinguish the authorized search of the computer from an analogous search of a file cabinet containing a large number of documents."); Bishop, 910 F.3d at 337 ("[A]s with filing cabinets, the incriminating evidence may be in any file or folder [of a cell phone]."). Thus, for purposes of the Fourth Amendment, a cell phone can be conceptualized as an enormous filing cabinet.

As one district court in this circuit recently noted, our Court of Appeals has twice rejected the "paradigm" that would require, in the context of searches of electronic devices, warrants to describe the "manner" of the search or "constrain it to items already known to law enforcement." Skinner, 2021 WL 1725543, at *15 (citing Cobb, 970 F.3d at 328; Williams, 592 F.3d at 521-22). While "the Fourth Amendment might require more specificity as to the place to be searched or the items to be seized in some computer searches," officers are generally not required to predict the items of evidence that an electronic search will uncover or predict where on the computer the evidence will be found. Cobb, 970 F.3d at 329 (emphasis added).

Rather, officers should search electronic devices in a manner that respects the limits of what is to be seized: They

26

should not go looking where the evidence to be seized is unlikely to be, and innocuous files should be viewed only "cursorily." Williams, 592 F.3d at 519; see also Cobb, 970 F.3d at 328 (holding that specificity in object of search (evidence of a murder) sufficiently "confined the executing officers' discretion").

Insisting that warrants carve out portions of computers and cell phones to be searched (thereby making other portions of the devices completely off-limits to law enforcement) has surface appeal but is neither constitutionally required nor practical in most circumstances. See Cobb, 970 F.3d at 329 ("Accordingly, more specificity was not required under the Fourth Amendment, nor was limiting the scope of the computer search practical or prudent under the circumstances of this investigation."). "As courts have had to recognize, the nature of electronic evidence requires that filtering occur at the review level. This means that a cursory review of innocuous material may sometimes happen in order to establish what information is relevant." Skinner, 2021 WL 1725543, at *18.

In determining a warrant's permissible level of breadth, a balance must be struck between "protecting privacy" and "permitting legitimate investigation." See Bishop, 910 F.3d at 338. There is constitutional breathing room between a warrant that, in retrospect, could have been narrower, and an

unconstitutionally overbroad warrant.  See Cobb, 970 F.3d at
328.

The warrant here authorized a search of the entire contents
of the phone.  In the space for the "premises" to be searched,
the warrant states, "a I-phone [sic] X Black in color; belonging
to Julio Hisael Almonte and in the possession of TCF. E.E.
Bostic."  (ECF No. 32-4.)  Emphasizing the vast amount of
information on the phone (and thus, subject to search),
defendant protests that the warrant should have established
boundaries for what could be examined.  Defendant contrasts the
breadth of the search with Trooper Bostic's stated purpose of
discovering the identity of the purported owner of the Raptor
(and driver of the Tacoma) and contacting that person.

Defendant acknowledges, however, Trooper Bostic's broader
purpose of investigating the "fraudulent scheme[]" whereby
defendant (and at least one other person, apparently)
fraudulently obtained multiple trucks.  (ECF No. 38, at 4.)
Trooper Bostic ended up finding evidence of a fraudulent scheme
in the phone's WhatsApp messaging application.  In retrospect,
therefore, Trooper Bostic could have limited his search to the
WhatsApp application or at least to the communications
applications, but he was not compelled by the Fourth Amendment
to do so.

Defendant cites <u>United States v. Burton</u>, 756 F. App'x 295 (4th Cir. 2018) in support of his argument that the warrant here was overbroad.  In this opinion, our Court of Appeals exercised its discretion to proceed directly to the question of whether the good faith exception precluded the application of the exclusionary rule.  <u>Id.</u> at 300-01.  In doing so, it "assume[d], without deciding, that the warrants were overbroad in violation of the Fourth Amendment."  <u>Id.</u>

Two warrants were at issue in <u>Burton</u>, and the one pertinent to the analysis here "authoriz[ed] the search of '[t]he entire contents of' [the defendant's] two cell phones, including photographs, contact lists, call logs, text messages sent and received, voice mail messages, and memory card."  <u>Id.</u> at 297.  A woman had accused the defendant there, Burton, of attempting "to take a photograph of her underneath her skirt (an 'up-skirt' photo)" at a grocery store.  <u>Id.</u>  Burton argued that because the warrant authorized a search of the entire contents of two cell phones (as opposed to just the photos on the phones) it was so obviously overbroad as to make reliance unreasonable.  <u>Id.</u> at 301.  More specifically, Burton argued that the warrant's scope was "far greater than necessary to locate the [up-skirt] photos allegedly taken during the grocery store incident."  <u>Id.</u>

In rejecting Burton's argument, the court explained that
the law on cell phone searches was less developed in 2011, when
the searches there took place:

> At that time, neither our precedent nor that of the
> Supreme Court had developed the robust privacy
> protections for cell phone users that are applicable
> today.  For example, until the Supreme Court's 2014
> decision in *Riley v. California*, officers could search
> cell phones without a warrant when the searches were
> conducted incident to a valid arrest.  In holding that
> a warrant is required in such circumstances, the Court
> in Riley reasoned that the "immense storage capacity"
> of cell phones, as well as the breadth and sensitivity
> of information that can be stored on such devices,
> justify more significant Fourth Amendment scrutiny.

Id. at 302 (citations omitted).  The court determined that the
officers' "fail[ure] to appreciate the breadth of the phone
warrant at the time it was issued" was not unreasonable.  Id.
Accordingly, "[g]iven the state of the law in 2011, as well as
the developing nature of cell phone technology," there would be
no deterrence value in applying the exclusionary rule, and thus,
no justification for doing so.  See Id.

Burton does not counsel in favor of deeming the warrant
here overbroad as to the scope of the search.  First, Burton is
distinguishable.  Law enforcement there had zeroed in a
particular object of search:  suspected up-skirt photos that the
defendant had denied taking.  Thus, the circumstances there may
have been such that a narrower search was not only possible, but
constitutionally required.

30

The circumstances here, by contrast, involved a suspected fraudulent scheme involving obtaining at least two (and possibly more) trucks using others' identities.  The investigation was unfolding, and a potential co-conspirator was getting further out of reach.  Although it is apparent now that Trooper Bostic did not need the phone's photos and videos, for example, in order to further his investigation, how could he have known at the time that the photos and videos would not help identify potential co-conspirators or victims of identity theft?  In short, the circumstances here made access to the entire phone reasonably necessary to advance the investigation.

Second, the court does not read Burton as condemning all searches of the entire contents of a cell phone.  The opinion merely assumed that the warrant was overbroad.  And it would be a large leap to read that assumption as mandating a default rule requiring cell-phone warrants to place certain portions of a cell phone off-limits.  Such a reading of Burton also would not comport with subsequent, published authority, such as Cobb.

The warrant here is not overbroad even though it allows a search of the entire phone.  The phone can be perceived of as an enormous filing cabinet.  "As with a search of a file cabinet, conducting a search of [cell phone] files for evidence of criminal activity necessarily requires law enforcement to sort through vast amounts of information to find the particular

evidence specified in the warrant." Skinner, 2021 WL 1725543, at *16. When there is probable cause to search a cell phone for evidence of a crime, limiting such searches to certain categories of data or to certain locations where such data resides is not typically required.

In retrospect, the warrant here probably could have limited the scope of the search without hindering the investigation. In the context of a developing criminal investigation, however, where the investigating officer had strong reason to suspect a fraudulent scheme but "didn't know exactly what [he] was looking for," (ECF No. 34, at 57), where defendant had tried to distance himself from the phone, and where time was of the essence, the Fourth Amendment did not require limiting the search to only certain contents of the phone.

### 4. Breadth of the Seizure

Although the warrant is not overbroad as to the "premises" that may be searched, it is overbroad in terms of what may be seized because it authorizes a wholesale seizure of everything on the phone. Again, warrants must not authorize a search or seizure greater in scope than existing probable cause can sustain; otherwise, they are overbroad. See Manafort, 323 F. Supp. 3d at 801 (noting that scope must "be limited by the probable cause on which the warrant is based."). In other words, "the breadth requirement commands that probable cause

exist for the items that are" to be seized.  Skinner, 2021 WL 1725543, at *9.

The language authorizing a seizure of everything on the phone is not facially problematic because sometimes probable cause exists for a wholesale seizure of all records.  See Hurwitz, 459 F.3d at 473-74; United States v. Oloyede, 982 F.2d 133, 139 (4th Cir. 1992); United States v. Indivior Inc., 448 F. Supp. 3d 587, 602-03 (W.D. Va. 2020).  Whereas a "particularity" challenge is usually a matter of language interpretation because too-vague language authorizing a seizure is inherently impermissible (unparticularized), an "overbreadth" challenge requires going beyond language interpretation and evaluating probable cause; this is because broad language is not inherently impermissible.  Compare Suggs, 998 F.3d at 1132-35 (analyzing "language and structure" in particularity context), with Hurwitz, 459 F.3d at 473-74 (analyzing whether scope of seizure was "justified by probable cause" in overbreadth context).

Hurwitz involved an overbreadth challenge to a warrant authorizing the seizure of all patient files in the defendant-physician's office.  Hurwitz, 459 F.3d at 466, 473.  The defendant said the search warrant was fatally overbroad because the seizure it authorized should have been limited to files belonging only to the five patients who were cooperating with the government's investigation.  Id. at 469-70, 473.  Probable

33

cause that a business is permeated with illegal activity, the court explained, is sufficient to sustain a seizure of all records.  Id. at 473-74.

Accordingly, the question was not whether the scope of the seizure was too broad on its face, but "whether a substantial basis existed for the issuing judge to find probable cause that [the defendant's] medical practice was permeated with his drug trafficking activity such that all of his patient files could be seized." Id. at 474.  Because there was such a substantial basis, the court found "no reversible error in the district court's decision to admit the evidence seized." Id.

Hurwitz thus reaffirmed a rule authorizing sweeping seizures in certain circumstances:

> [W]here there is probable cause to believe that a business is "permeated with fraud," either explicitly stated in the supporting affidavit or implicit from the evidence therein set forth, a warrant may authorize the seizure of all documents relating to the suspected criminal area but may not authorize the seizure of any severable portion of such documents relating to legitimate activities.

Id. at 473 (4th Cir. 2006) (quoting Oloyede, 982 F.2d at 141).

The application of the permeated-with-fraud rule,[12] however, is not liberally applied outside the business context:

> When an individual's allegedly fraudulent business activities are centered in his home—as apparently was

_____

[12] As evident by the appeals court's application of this rule to drug trafficking activity, it reaches beyond the fraud context. See United States v. Hurwitz, 459 F.3d 463, 474 (4th Cir. 2006).

> the case here—the "all records" doctrine must be
> applied with caution.  As the district court noted, it
> would require extraordinary proof to demonstrate that
> an individual's entire life is consumed by fraud and
> that all records found in the home were subject to
> seizure.  Without such unusual proof, the broad
> categories of items that may be seized pursuant to an
> "all records" search of a home must be sufficiently
> linked to the alleged criminal activity so as to
> distinguish them from innocent, personal materials.

United States v. Falon, 959 F.2d 1143, 1148 (1st Cir. 1992).

Assuming that the permeated-with-fraud rule could permissibly be applied to some searches of personal cell phones, it does not apply to the phone here.  Cf. Indivior, 448 F. Supp. 3d at 604 (rejecting argument against seizure of personal data on company-issued phones).  Courts "review a magistrate judge's decision to issue a search warrant with great deference, asking only whether the judicial officer had a substantial basis for finding probable cause."  United States v. Blakeney, 949 F.3d 851, 859 (4th Cir. 2020) (quotation marks omitted).  Review is confined "to the facts that were before the magistrate judge."  United States v. Lyles, 910 F.3d 787, 791 (4th Cir. 2018).  "Probable cause requires only 'the kind of fair probability on which reasonable and prudent people, not legal technicians,' would rely."  United States v. Jones, 952 F.3d 153, 158 (4th Cir. 2020), cert. denied, 141 S. Ct. 1080 (2021) (quoting Florida v. Harris, 568 U.S. 237, 244 (2013)).

As in Hurwitz, the legality of the seizure's breadth here depends on whether the permeated-with-fraud rule applies.  It does not apply.  Although there was certainly a substantial basis to find probable cause implicating defendant in a fraudulent scheme and indicating that the phone contained evidence of such a scheme, there was not a substantial basis to find probable cause that the phone was permeated with fraud.

The written application and the supplemental, recorded colloquy between Trooper Bostic and the magistrate establish the defendant's possession of what were very likely fraudulent ID cards, his possession of a truck likely obtained using identity theft, and his association with the driver of a second such truck.  The phone was receiving calls and texts from the purported owner of the Raptor, and defendant had stated that the purported owner's contact information was on the phone.  Defendant was associated with a driver of a hit-and-run (he had the key to the Tacoma), which tended to support that both the Tacoma and the Raptor had been fraudulently obtained.

All of this provided the magistrate with more than a substantial basis for a search of the phone for evidence of the fraudulent scheme as detailed in the colloquy.  It fell short, though, of providing the magistrate with a substantial basis to

conclude that the entire contents of the phone were subject to seizure.  Thus, the warrant authorized an overbroad seizure.[13]

### 5. The Good Faith Exception

"Evidence obtained in violation of the Fourth Amendment . . . is generally subject to suppression under the exclusionary rule." United States v. Perez, 393 F.3d 457, 460 (4th Cir. 2004).  The exclusionary rule breathes life into the Fourth Amendment's guarantees by deterring "future Fourth Amendment violations," not by providing a personal right of exclusion to redress a Fourth Amendment injury.  See Davis v. United States, 564 U.S. 229, 236 (2011).  Because deterrence is the "sole purpose" of the exclusionary rule, the Supreme Court has limited its "operation to situations in which this purpose is 'thought most efficaciously served.'"  Id. at 237 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)).  "To trigger the exclusionary rule, police conduct must be sufficiently

---

[13] Because the Fourth Amendment often permits the entire "premises" of an electronic device to be searched, the limitations on what is to be seized (both in terms of particularity and breadth) take on heightened importance in the electronic search context.  The limitations on the seizure indirectly restrain the search by making it targeted to evidence of a particular crime, not evidence of crime in general.  Thus, the deficiency here is not a "hypertechnical" one:  It has a significant affect on the privacy interests at stake.  See Oloyede, 982 F.2d at 138 ("The Fourth Circuit has held that courts should not suppress evidence seized pursuant to a warrant because of 'hypertechnical errors.'").

deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. 135, 144 (2009).

In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court established an exception to the exclusionary rule. This exception was to address cases where "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." Id. at 920. The Court explained,

> In most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.

Id. at 920-21. And deterring magistrates "is not the office of the exclusionary rule." Davis, 564 U.S. at 239.

"When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." Leon, 468 U.S. at 924. "As a general rule, when a neutral magistrate has issued a warrant, the issuance 'suffices to establish' that a law enforcement officer has 'acted in good

38

faith in conducting the search.'"   Skinner, 2021 WL 1725543, at

*20 (quoting Leon, 468 U.S. at 922).

There are four circumstances, however, where the good faith

exception does not apply:

- First, where the magistrate or judge in issuing a
  warrant was misled by information in an affidavit
  that the affiant knew was false or would have known
  was false except for his reckless disregard of the
  truth;

- Second, where the magistrate acted as a rubber stamp
  for the officers and so wholly abandoned his
  detached and neutral judicial role;

- Third, where a supporting affidavit is so lacking in
  indicia of probable cause as to render official
  belief in its existence entirely unreasonable; and

- Fourth, where a warrant is so facially deficient—
  i.e., in failing to particularize the place to be
  searched or the things to be seized—that the
  executing officers cannot reasonably presume it to
  be valid.

See United States v. Williams, 548 F.3d 311, 317–18 (4th Cir.

2008) (internal quotation marks, alterations, and citations

omitted).   In these four circumstances, reliance on the warrant

is unreasonable.   See id. at 317.

Defendant argues that the third and fourth circumstances

described above apply here:  that the indicia of probable cause

were severely lacking (third) and that the warrant was severely

deficient on its face (fourth).   As the court explained above,

the warrant's deficiency is best perceived of as a lack of

probable cause to sustain a seizure of the entire contents of

the phone, not as a facial deficiency.  Although the breadth of
the seizure may have rendered the warrant facially <u>suspect</u> to
the objectively reasonable officer, without reference to the
extent of the probable cause present, the breadth of the seizure
would not render the warrant facially deficient or, as pertinent
here, "so facially deficient that the executing officers could
not have reasonably assumed that it was valid."  <u>United States
v. Qazah</u>, 810 F.3d 879, 886 (4th Cir. 2015).

Accordingly, the court moves on to whether probable cause
for a seizure of the entire contents of the phone was so lacking
as to make reliance on the warrant entirely unreasonable.
Unlike determining whether there was a substantial basis for the
probable cause determination (whether the warrant was valid), in
the good faith analysis, our Court of Appeals has "consistently
rejected the notion that reviewing courts may not look outside
the four corners of a deficient affidavit when determining, in
light of all the circumstances, whether an officer's reliance on
the issuing warrant was objectively reasonable."  <u>United States
v. McKenzie-Gude</u>, 671 F.3d 452, 459 (4th Cir. 2011).  What is
still forbidden, however, is an inquiry "into the subjective
*beliefs* of law enforcement officers.  <u>Id.</u> at 460 (emphasis in
original).  In other words, courts may consider "actual
uncontroverted facts known to . . . [the] officer," but may not
engage in "fruitless inquiries into the minds of police officers

40

to ascertain motive." See id. (citation and question marks omitted).

There is no doubt that the warrant was too broad as to the seizure it authorized and that there was no substantial basis for the breadth of the seizure.  That is not dispositive; if it were, the good faith exception would "be devoid of substance." See United States v. Bynum, 293 F.3d 192, 195 (4th Cir. 2002). All that the government must show is that the officer's reliance on the warrant here was not entirely unreasonable.  "This is a less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place."  See id.  Reliance here was not entirely unreasonable.

First, this was an electronic search, and the difference between what is to be searched and what is to be seized is less obvious with digital data than with physical objects.  Had Trooper Bostic relied upon a warrant that allowed him to search defendant's entire home and seize everything in it, the unreasonableness of the seizure would have been more apparent. This is not to minimize the unnecessary invasion of privacy that may occur when a warrant, like the one here, authorizes an unnecessarily broad seizure of cell phone data; the point is merely that it is easier to mistakenly think a broad seizure of data is appropriate.  As discussed above, there was indeed probable cause here to justify a search of the entire phone.  It

41

was not entirely unreasonable to conflate the scope of the
search and seizure on these specific facts.

Second, the colloquy between the magistrate and Trooper
Bostic here is instructive.[14]   Trooper Bostic both sought and
executed the search warrant here.   In doing so, the magistrate
engaged in a colloquy with Trooper Bostic that reasonably could
have led Trooper Bostic to believe the scope of the seizure was
acceptable.   After reciting what was to be seized, the
magistrate asked, "These are the items that you are going to be
looking for; is that correct, sir?"   (Ex. 1.)   Trooper Bostic
said yes and added, "I'm looking for the information that's on
the iPhone."   (Ex. 1.)   The magistrate offered no indication
that Trooper Bostic needed to refine what was to be seized.

Another important part of the colloquy occurred after
Trooper Bostic had finished explaining the fraud scheme in which
he suspected defendant to be implicated.   As Trooper Bostic was
concluding, "[s]o I feel that the information is pertinent to --
," the magistrate cut him off and said, "All this
investigation?"   (Ex. 1.)   The magistrate then added that "there
may be a lot more contained on that phone than just the
information to find this F---?," to which Trooper Bostic agreed.
(Ex. 1.)   This discussion could solidify what might otherwise be

---

[14] The court is not delving into what Trooper Bostic thought
here, but merely what an officer in his shoes reasonably could
have thought.

a reasonable officer's shaky confidence in the scope of the
electronic seizure here.  The magistrate's comments tended to
suggest that the scope of "all this investigation" and the fact
that there may be lots of evidence on the phone justified a
broad seizure.  (Ex. 1.)

Third, while the warrant's language does authorize a
seizure of the entire contents of the phone, it also lists
specific categories of data on the phone that could be seized.
This list does not undo the broader language, but it does make
it at least somewhat more difficult to appreciate how broad the
authorized seizure actually is.  Trooper Bostic himself
understood the warrant to allow him to download the entire
phone.  The good faith inquiry, however, is objective, and the
inclusion of the list moves the reasonableness needle (at least
a little) in the government's favor here.  Cf. Manafort, 323 F.
Supp. 3d 795, 802 (E.D. Va. 2018) ("[C]ourts have recognized
that where, as here, a warrant contains an illustrative list of
records, that list further limits the discretion of the
executing agents by requiring executing agents to construe the
warrant in light of the illustrative list and to seize only
records similar to those records listed in the warrant.").

Finally, as the government points out, the scope of the
actual seizure here was small.  Trooper Bostic did not know at
the hearing whether any law enforcement agency had done a full

download of the phone, and he certainly had not done a full
download himself.  It appears correct that "[n]o wholesale
searching occurred here, despite the broad authority the warrant
may have granted."  United States v. Grimmett, 439 F.3d 1263,
1270 (10th Cir. 2006).  To the extent that this tends to show
Trooper Bostic's subjective good faith, it is an impermissible
consideration for this court.  However, it may offer some slight
support for the proposition that an objectively reasonable
officer could believe the warrant to be sufficiently limited,
and it may relate to the overall requirement that, "[t]o trigger
the exclusionary rule, police conduct must be . . . sufficiently
culpable."  Cf. Herring v. United States, 555 U.S. at 144.

Defendant naturally cites Burton in support of his argument
that the good faith exception does not apply here.  For the
reasons stated previously, the court does not believe that
Burton counsels in favor of suppression here.  The state of the
law certainly changed between the time of the search in Burton
and the time of the search here such that there were more
"robust privacy protections for cell phone users" at the time of
this search.  See Burton, 756 F. App'x 295, 302.  Foremost among
those cases was Riley.  Here, Trooper Bostic followed the
Court's instructions in Riley.  See 573 U.S. at 403 ("Our answer
to the question of what police must do before searching a cell
phone seized incident to an arrest is accordingly simple—get a

44

warrant."). The warrant Trooper Bostic got turned out to be defective, but not so defective to make reliance on it entirely unreasonable.

### III. **Conclusion**

The traffic stop was justified at its inception and not unreasonably prolonged. Trooper Bostic had probable cause (of defendant's possession of marijuana) and consent to search the Raptor. Regardless, defendant has no standing to contest the search of the Raptor. As to the phone, the warrant is invalid. The scope of the search was acceptable; the scope of the seizure was not. There was no substantial basis for the magistrate to find probable cause that the phone was permeated with fraud, so the warrant's authorization to seize the entire contents of the phone ran afoul of the Fourth Amendment. Despite the warrant's deficiency, reliance upon it was not entirely unreasonable, as it must be to justify the "extreme sanction of exclusion." See Leon, 468 U.S. at 926.

For the foregoing reasons, the evidence derived from (1) the stop of the Raptor; and (2) the subsequent seizure and search of the phone should not be suppressed, and defendant's motion to suppress (ECF No. 24) is **DENIED**.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record, the United States

Marshal for the Southern District of West Virginia, and the

Probation Office of this court.

      **IT IS SO ORDERED** this 4th day of March, 2022.

ENTER:

David A. Faber
Senior United States District Judge